Our next case is number 2012-1120, BIOGEN v. GLAXOSMITHKLINE. May it please the court, counsel. This appeal is about whether or not the claim term anti-CD20 antibody should be given its plain and ordinary meaning, which is an antibody which binds to a cell surface CD20 antigen. What was LPM's position on this? That is a question I didn't prepare for you. Okay. I'll withdraw the question. There's no dispute that the specification defines the term in the way that I just stated. And there's no dispute that those words describe the plain and ordinary meaning. And there's no words in the claim which limit the term, other than what I just stated. So I plan on addressing two points. First, the prosecution history does not support a finding that the applicant made a clear, unmistakable, unambiguous disclaimer of that plain and ordinary meaning. So the district court's reading in to that term the requirement that the anti-CD20 antibody have similar affinity and specificity to the preferred embodiment, rituxim, is error. Let me throw you a curveball here, which hopefully you will be able to answer. And that is, if you look at page 325 of the joint appendix, there's another part of this response to the examiner's rejection, which could be read, and this is the second paragraph, beginning the antibodies to be used, which could be read as limiting to the antibodies that are covered by this claim to those described in the 137 patent. Why isn't that the correct interpretation of the prosecution history? That's closer, I believe, to the correct interpretation. What that is referring to is, I believe, the antibodies that could be made or selected by the methods described in the 137 patent. But if it were limited to the antibodies described in the, or claimed in the 137 patent, that would exclude Azira, right? Because those are only chimeric antibodies, and Azira doesn't fall into that category. Am I correct about that? No, Your Honor. I don't believe that that statement, nor the 137 patent, is intended to limit itself to chimeric antibodies. I believe that wasn't really the question. I understand, and I'll give you the chance to make that argument, but my question is, the 137 patent is limited to chimeric antibodies, right? Well, the 137 patent talks about rituxim, which is a chimeric antibody, but the section of the 137 patent that that is describing talks about methods that are much more general in terms of making and selecting antibodies. But that was a problem in the prosecution of the pen, is that the scope of the pen was too broad, and didn't Biogen in prosecution limit the scope by saying that you're looking at an antibody that binds with CD20 with a similar affinity and specificity as does rituxim? That is one statement out of the prosecution history. Why is that not a clear disclaimer? Because the prosecution history, when read in its entirety, makes very clear that that one statement is an example of one antibody, the preferred embodiment, that could be made with the methods described and disclosed in the specification, including the incorporated 137 patent specification, and that the full scope of what the patentee was entitled to is the full scope of the claim. And that's made extremely clear on page JA328 of the office action response that the court indicated, where it says, Thus, applicants respectfully submit that disclosure may be found in the specification for all items which the examiner has alleged were missing and are allegedly required for the specification to enable the presently claimed method. And the presently claimed method is any CD20 antibody that is therapeutically effective that reduces circulating tumor cells. It goes on. Wasn't at that time, wasn't the use of the antibodies limited to chimeric bases? No, no. There are disclosures in the specification for humanized and human, and there are dependent claims that cover those. So, no. There were methods. So, are you saying that the patent covered forever all use of antibodies? No. The patent covered. The examiner said, look, you've enabled the use of one preferred embodiment. There's a wide range of antibodies with different structural and functional properties that could also be therapeutically effective. You haven't enabled all of those. The answer was, yes, we have, because we've disclosed methods that are commonly known by those of skill in the art that can discern which of that broad universe are therapeutically effective. And the next sentence of the closing part of the memo, which I'm about to read, says exactly that. It has alleged missing and are allegedly required to enable the presently claimed methods. Most of these items... I think if I understand the difference here, what you're saying is that the disclaimer was not a disclaimer limiting it to specific antibodies, but a disclaimer that limited it to a particular method of identifying the antibodies. Not to any particular method. It was essentially what the examiner was saying is your claim is limited now. Just as a starting point, is that not what you're saying? You're saying it's not limited to specific kinds of antibodies, but it's limited to antibodies identified by a particular method or by some method. It is limited to antibodies that are effective to treat the disease and according to this claim at this time effective to reduce the circulating tumor cells discovered by any method known by one of skill in the art at the time. Under the method you're claiming. Many of which, yes. Now, follow up that question with this one. I see what you're trying to say. What you're saying is we're not limiting ourselves to any particular antibody. We're talking about all antibodies that will work therapeutically through this method and that are known. How about those that are not known? What about future discoveries of antibodies that are not known at the time of this invention? The prosecution history hits that dead on. Again, the novelty of the presently claimed invention doesn't lie in a method of making therapeutic antibodies. Although antibodies to be designed in the future for use in the claim methods would certainly be encompassed. Rather, the presently claimed invention concerns the use of such antibodies for the treatment of CLL. Your Honor, in further response to your question, the patent is not limited to a method of making or a method of screening. We have to look at the circumstances that existed at the time the patent was issued or the prosecution occurred. Correct me if I'm wrong, but at that time there were no anti-human antibodies that dealt with the CD20 bodies. Well, at the time of this invention, your Honor, there was no, no one knew that anti-CD20 antibodies of any type, humanized chimeric of any type, would be useful to treat this disease. That was the invention here, that the antibodies of any type would be used to treat the disease. And the patent discloses... What's the disease at that time? It was a non-Hodgkin's disease. Correct. At the time of this claim, later on the claim was limited to CLL specifically, but at the time of this claim it was CLL and other non-Hodgkin's lymphoma diseases, because it was thought, generally thought, that those diseases, because they didn't have a high volume of circulating cells, because they did have a high volume of circulating cells, and because the surface didn't have a lot of CD20 antigens, that this method wouldn't be useful for. All right, so let's talk about the method. Isn't there a difference in the way that the antibodies attach to the epitome with respect to the 137 patent and the subsequent patent? The patent doesn't concern itself with the method of their attachment. The screening process... That's what the science does, doesn't it? The 137 patent attaches the antibody to the larger loop of the epitome. That's not discussed in the 137 patent at all. I mean, the only thing that's discussed in the 137 patent... Wait, wait, wait, you keep talking about the patent. We're talking here about the prosecution history. And if specificity in the prosecution history refers to the epitome, then you've got a problem. I'm sorry. If the prosecution limits you to those having specificity to the particular epitome, then you lose, right? Yeah, but it doesn't. I mean, the prosecution history... Well, that's the question. Well, the prosecution history, nowhere in the applicant's response does the word epitope appear. But it's in the examiner's rejection. Yeah, and the only place that refers to the examiner's rejection is anti-CD20 antibodies are defined as being not limited to those of any particular specificity, affinity, or epitope-binding site. That's the only place epitope appears. That was his concern, and your answer to him was, that's right, it's not supposed to be. No, our response to that did not at all talk about epitopes at all. Well, it depends what's meant by specificity. Well, the specificity means specificity to the CD20 antigen. Well, that's what you say, but there's an alternative possibility, and that is specificity is referring to the epitome, to the binding site. But that isn't disclosed anywhere in the 612 patent or in the 137 patent. There's no intrinsic record support. Or specificity could mean binding to other types of cells, couldn't it? Well, that's exactly what it does mean, whether it's specific to the CD20 antigen or it binds to a number of other different cells. Why is that an issue if it's clear that the prosecution history, and I'm currently in agreement on your client, that there was a limitation to the affinity and the specificity of our retouchment? All that was meant by that was that when you use these methods to determine NACD20 antibodies that work, that are therapeutically effective, you need to determine that they have some level of strength. And that statement was in reference to this is the general level of strength that's required. And that's all that meant. It was an example, not a statement of limitation. Well, that's an interesting lawyer argument, but did you have an expert in this field to come in and say that's the way you should read it? Well, we didn't need to. That's what the specification says. Your Honor, I'm down to only two minutes. Well, don't worry about it, okay? I'll give you rebuttal time. We still have questions here. Okay. Keep going. So, I want to come back for a moment to 325 in reference to the 137 patent. Azera is not a chimeric antibody, correct? Correct. So, isn't the 137 patent limited to chimeric antibodies? The claims of the patent.  I'm talking about the 137 patent. Stay with me, okay? Okay. Well, the 137 patent is the one that's incorporated. I know. Okay. The claims of the 137 patent are limited to chimeric antibodies, are they not? Right, but the 137 patent is limited to rituxim. And the only reason the 137 patent is incorporated into the 612 patent is to describe the methods of making or selecting antibodies. It's not meant to incorporate any of the claim limitations or anything. Well, that may be, but the problem is in the prosecution history, you said the antibodies to be used for the claimed immunotherapy were described in detail in U.S. Patent 137. That's a reference to the claimed antibodies in the 137 patent, isn't it? Right, but I believe if you read further down in that sentence, what it's referring to is the method of screening, isolating, and characterizing those antibodies, not the specific antibody that was characterized by that patent. If you read further, including the part that I was quoting, what really they're talking about there is there are methods that are disposed of screening and isolating these antibodies in the 137 patent. If you use them on chimeric or human or humanized or whatever, you can find antibodies of sufficient strength to treat the disease. Okay, so what you're saying, and this gets back to my earlier question, is that this is limiting it to antibodies using the method described in the 137 specification rather than to the antibodies that are claimed in the 137 patent. Is that a fair statement? Not quite what I intended. It is limited to antibodies that you discover from whatever method known to those of skill in the art at the time that are able, that are anti-CD20 antibodies, that are therapeutically effective and under the current limitation that reduce circulating tumor cells. So, it isn't a patent limited by a method of making or a method of screening the antibodies. The limitations in the patent relate to the use of a particular antibody to treat the anti-CD20, to attack the anti-CD20 antigen. And that's exactly, there are three quotes on that in the patent, and one of them is right on. It says, the novelty of the presently claimed invention doesn't lie in anti-CD20 per se. I understand, and you've got a good point that maybe the claim as originally written was that broad. But what we're struggling with is whether the prosecution history imposes some sort of limit on that. Right, but the claim was amended in this action to limit it to a therapeutically effective, meaning a reduction in circulating tumor cells. And so, that was the limitation that was operational to limit the scope of the claim. And what the applicant was saying is, whatever methods you use to screen and isolate those, if it treats that, then it fits within the scope of the claim and the full scope of the claim is enabled, because picking, screening antibodies is well, well known. It's not the subject of the invention. Other questions? Okay. Thank you. We'll give you three minutes for rebuttal. Thank you. Thank you. Ms. Ferry? Good morning, Your Honors. May it please the Court, Counsel. I'm here on behalf of Appellees, GlaxoGroup Ltd. and GlaxoGroup, and we're asking the Court to affirm the District Court's decision. Speak up, please, so that we can hear you well. Your Honors, the patent application in this case was pending in the Patent Office for ten years. And during that ten years, it was greatly narrowed to both disclaimer and to claim amendment in order to gain allowance. And that is why the file history… Why don't you address for us how to read this prosecution history that we've been struggling with. Well, Your Honors, as the District Court said, this file history is the clearest evidence of being on this claim, anti-CD20 antibodies. And what it does is it shows that there was a clear disclaimer. What we see here is that the examiner rejected the claims under 112. And the basis of that was that there was only one example in the patent, only rituximab, while the scope of this anti-CD20 antibodies entails all, as the examiner said, all antibodies, regardless of the specificity or the affinity of the specific epithel on circulating cells. And what the examiner said also was that the selection of the antibody as an immunotherapeutic agent, so in order to work here in therapy, is an unpredictable task because this antibody has to have sufficient specificity and affinity. So the examiner was going right to the heart of this, is that the specificity and the affinity are key to turning this antigen on so that it destroys this cancer cell. Okay, but what they say is that specificity here refers to the antibody's preference for this particular antigen as opposed to its preference for the particular binding site. How do we know who's right about that? Well, Your Honor, there's absolutely nothing in the record that supports that. Supports what? Their argument that it's to one antigen over the other. Well, their argument doesn't have to be supported. Your argument has to be supported because under our law there has to be a clear and unmistakable disclaimer. And if it's ambiguous or unclear or unmistakable, that's your problem, not theirs. Yes, Your Honor. And specificity, would you agree that actually the large loop, small loop business wasn't discovered until after this invention? Is that correct? Well, Your Honor, the small loop was not. Is that correct? The small loop was not discovered until later. The large loop was well known. Yes. Everybody thought the large loop was the epitome. Okay. Now, here's my question to you. Could specificity in that context refer not to which of the unknown loops at the time it would attach to, but other kinds of cells? That is, it was specific to the CD20, anti-CD20 cell, rather than specific to some other cell. Is that a reasonable use of specificity? No, Your Honor. And I would say I only mention that there's no support for their position, but there is plenty of support for our position, which I'll take the court through. First of all, the examiner tied affinity and specificity to the specific epitope. So, the examiner herself identified that those are related to epitope. But there's also other support in the intrinsic evidence. The examiner also, in the same office action at JA308, 309, in talking about antibody fragment, describes the necessity of the antibody fragment to recognize the designated epitope or binding site for treatment of a hematologic malignancy. So, she's tying, again, the idea that binding with this epitope is key to the therapeutic value. And even more importantly, Your Honors, this is, we're talking now, the third example here, is the specification. The patentees argue that the 137 patent must be read as incorporated into the specification so that we rely on it, while the 137 patent talks about antibodies similar to a toxin and describes them as having specificity to an epitope of CD20. This is at JA379, column 10, line 37. Hold on a second. 379, column 10, line 37. What changes occur in the specification to respond to the examiner's inquiry? Excuse me, Your Honor, what changes happen to the specification to respond to the examiner's inquiry? Well, in responding to the examiner, in terms of the rejection, what they did was they pointed to this 137 that's incorporated into the specification, and saying, in the 137 patent, this gives an example of the creation of an antibody from the same tracheostoma as Ritophrenin. So, actually, the 137... So, they used that as an example. They had an example there. But they didn't say, this is the kind of antigen that will only work. What they said, Your Honor, was that this antibody that's described and claimed in the 137 is very narrow. It's just Rituxan and other antibodies that come from the same tracheostoma, the same cell. So, it's very limited. They said, look, we are not claiming all antibodies in our claim treatment, in our therapy. What we're claiming is the antibodies are of similar specificity and affinity. They bind to CD20 with the same specificity and affinity. So, this is necessarily a subset of all anti-CD20. The examiner was clearly worried about enablement, don't you think? Absolutely, Your Honor, and I think... Why didn't you challenge this on enablement? Why didn't you attack this patent on enablement? Well, Your Honor, in our brief, we address the idea of enablement, and also in terms of... In your brief, the only issue you identify is this claim construction question as to whether the response in the prosecution history was a disclaimer. That's the only issue you raise in your brief. You mean before the district court? I meant here in terms of our brief before this court, Your Honor. In the district court, we concentrated on the disclaimer, but that's related to the enablement. Well, was there an enablement defense here which was avoided as a result of the result falling from the claim construction? Well, Your Honor, since the rejection was to 112, we argued before the district court that this narrowing of the claim scope was absolutely supported by enablement law, because the idea... No, no, I don't think you're understanding what we're asking you about. Is there an enablement issue in this case which isn't before us because of the way it was resolved on the claim construction? Yes, Your Honor. If this case were to go back to the district court, if this court were to find that there wasn't a disclaimer, there would be an enablement issue. So those issues remain in the case. Yes, Your Honor. And I think that it finds some root, certainly, in this disclaimer argument, because we pointed out the examiner gave this 112 rejection because there was only one example. And this is a very broad genus. That is, I think, long-standing law in this court. There are a number of precedents. In an unpredictable arc, such as this biotechnology, one example like this cannot support a full genus. Cases like N. Ray Goodman, N. Ray Wright, N. Ray Beck, even Regence v. Eli Lilly, that this was a very broad genus, and they gave retoxic, only one example. At that point in time, in 1998, it would have been very unpredictable for someone of ordinary skill in the art to determine what other antibodies could perform the way it's supposed to in this claimed method to treat someone effectively. But even at that point, one skill in the art would only be able to point to antibodies that attach to the large epitope, because that was a science at the time. Absolutely. So let me ask you, so the Azeropan, the method there is that the antibody attaches to the small epitope. Yes, Your Honor. So would you say that even if your opponent is saying this is about methods that we're dealing with here, would you say that the Azeropan is a different method patent than the 137 patent? Well, Your Honor, it certainly is made by a different method, the Azeropan. And I think if you look at the Dean's declaration, which is JA 724 through 737, she discusses, this was our expert for Longwood District, Oregon. She discusses what was known at the time, and also discusses Arzera, the discovery of the small, just to focus that that wasn't known in 1998. So I think that's important, Your Honor, because if you look at the method for creating an antibody in the 137 patent that they rely upon, they're only talking about making an antibody from the Rituxan transfectoma. That method is not the way Arzera was made. And the fact of the matter is, all those murine antibodies, like Rituxan, they don't bind with the small loop. Their answer is this patent doesn't have anything to do with any of those questions. This is a method for attaching the antibody. It's a method for treating a patient with CLL in order to provide them effective treatment. They have to have a positive clinical benefit. Using any antibody that will provide therapeutic treatment. And that's their answer, and it seems to me, arguing over the fact that there are products that are made by a technique other than Rituxan, it seems to me they have a pretty good argument that that's really not at issue in this case, is it? Well, Your Honor, but what is at issue here is that the examiner said that you have to select the appropriate antibody to get this effective treatment. You have to have the right specificity and affinity. Right. It can't be any antibody. They didn't come back to the examiner and say all antibodies. It has to be an antibody. It's pretty similar to Rituxan because this is unpredictable, is what the examiner said. Someone of ordinary skill in the art wouldn't have any reasonable expectation that some other antibody would work to treat this. And I would add, Your Honor, not only is it an art that's unpredictable, it's a method treatment that's very unpredictable. This isn't a method treatment where you just give an antibody to someone with CLL, like many methods are. What they argued in the patent office and to the district court is that when you give this to a person with CLL, they have to have a positive clinical benefit. They have to go into a partial or full remission. And that's very unpredictable. All antibodies may not do that. As they argued to the district court, in some instances, even Rituxan does not do that. Let me point you to the second paragraph on 325 before we run out of time. So the antibodies to be used for the claimed immunotherapy were described in detail in the 137 patent. Does that limit it to the antibodies described in the 137 patent? Is that itself a disclaimer? Well, Your Honor, yes. I believe that the 137, the citation by applicants to the 137 patent, in combination with their statement that their claimed method is to use antibodies that bind to CD20 with similar specificity and affinity to Rituxan, and that by looking at the 137, you can isolate those specific subsets from a larger subset. Well, that's an awfully vague statement. By looking at the 137, you can identify that subset. The 137 claims specific antibody, which I guess is Rituxan, right? Yes. And so if that were viewed as a disclaimer, that would essentially be saying we're limiting it to Rituxan itself, no? Yes, Your Honor. If we did, if we limited it to just 137. But I think the point that applicants were making was that a person of ordinary skill in the art could use that method, and that there might be some variability when they produce antibodies. Well, I guess what I'm asking is this statement in the second paragraph there seems to limit it to Rituxan itself, which is the only antibody described in the 137 patent. But I guess what you're saying is that the statements on the previous page about having similar affinity and specificity broadened what they were, or narrowed the scope of the disclaimer. Yes, Your Honor. I think our position is that the examiner came and said, look, this very broadly, all anti-CD20 antibodies you don't support. You only have the toxin. They came back and they expanded it just a slight bit and said, well, those that align with similar specificity and affinity, because that could be identified by a person of ordinary skill in the art, because they knew that all the antibodies that worked therapeutically bound to this epithelium. So if they had that type of specificity and affinity, that that would be part of their claim. And I think that helps. So it's your position that in order for their method to be used, it must be used by an antibody that is either Rituxan or something created similarly to the way Rituxan is created? Yes, Your Honor. To have that specificity and affinity that at least they supported that much in respect, that there would be a reasonable expectation that you could treat a patient. Anything outside of that was completely unknown in 1998. Your Honor, I would just add one other point to that that you were discussing about that it's not just Rituxan, but similar specificity and affinity to it. That goes away with this argument they had of somehow they're trying to exclude future technology. If an antibody is discovered tomorrow that has similar specificity and affinity, it falls within the claim. It's just antibodies that fall outside of that, whether they came before or after, fall outside of that claim. So with respect to claiming a method, as your opponent has said, so what's a starting material under the 137 patent? My understanding is it's shimeric, and the basis of a starting material is shimeric. And for Azera, what's the starting material there? Well, the Rituxan is chimeric. It comes from urine, so it's mouse. For Azera, it's fully human, so that is the difference. So there's a difference in the starting material under both of the patents? Absolutely, Your Honor, and I think that that is what Dr. Deans, Dr. David went through. And it's not just Deans. It's also intrinsic evidence. The Einfeld and the Polyax references that are on the front of the patent that were incorporated here and given to the examiner, they discussed this large loop and that that's where all the antibodies at that time bound to, and that that was all that was known wasn't later until the smaller loop was discovered. And what they believe is this is only uncovered by fully human antibodies. So in 1998, goodness knows. Any other questions? All right. Thank you, Ms. Vernon. Thank you, Your Honor. Mr. Alcott, you've got three minutes. Thanks, Your Honor. May it please the Court again. I want to make three points. First is the patent very clearly is not limited to chimeric or human or humanized or any particular type. On page 326, J.A. 326, the office action states that the specification has not taught how one skilled in the art would make the necessary chimeric, humanized, or human antibodies. However, at page 5, fourth paragraph, the specification states that methods for producing chimeric, primate, human, humanized antibodies are well known in the art, and moreover, patents disclosing that technology are incorporated by reference. There are other patents incorporated by reference other than the 137 patent. So there's no question this patent doesn't have anything to do with how they're made. The question is, are they used? Can they be used to treat the disease? It's the discovery that these types of anti-CD20 antibodies can be used to treat these particular types of cancers. It's the first time anybody's discovered that. Second, on specificity, at J.A. 376, the 137 patent at column 3, lines 30 to 36, in essence, such targeting can be generalized as follows. Antibodies specific to the CD20 surface antigen of B-cells are injected into a patient. These anti-CD20 antibodies specifically bind to the CD20 surface antigen of both normal and malignant B-cells. The anti-CD20 bound to the CD20 surface antigen may lead to the destruction and depletion of the B-cells. That is the specificity that is being talked about in this patent. The epitope... Why doesn't it say that, then? That's exactly what it says. No, I'm saying in the prosecution history. Well, in the prosecution history, it's absolutely clear at the bottom of 325 that the only specificity they care about is specificity enough to treat the disease. Moreover, it is clear from the disclosure that the specificity must be such that the antibody therapy results in a reduction of circulating tumor cells. That's the only specificity they care about, that it's specific enough to bind to the CD20 antigens so that there's a reduction in circulating tumor cells and it treats the disease. The word epitope is absent. The one site that counsel pointed to on epitope is a sentence, a stray sentence, that talks about some other reference discussing epitope, not the patent itself. There's no intrinsic evidence that in any way ties anything to one loop or another. And the patent is crystal clear. Why didn't you bring in expert testimony to address this? It's intrinsic. Nothing I've said requires expert testimony. It's intrinsic. It's the intrinsic record that we're relying on. Because that's as far as a science went at that time. This science was limited to the large loop. No. The science here is the science of selecting antibodies. And that's described, and it's well known, you take a mouse that you know produces anti-CD20 antibodies, you inject it with CD20 antigens, and then you pick the ones that are the strongest. That's the science that this patent's talking about. Whether it's large loop or small loop or the precise affinity or specificity, that is not a part of this patent. All you need to do is figure out those that are strong enough to attack. What we're talking about is not the meaning of the original patent and the scope of the original patent claims, but what was meant by these limitations that the applicant advised the examiner about. Well, there's no limitation. There was no limitation added as a result of this. No, there was no language added to the patent, but there were statements made to the examiner. And basically you're saying they weren't statements of limitation at all, right? Well, at the end of the day, the applicant said that disclosure must be found in the spec for all items that the examiner cares about and didn't amend the claims. And then the examiner withdrew the rejection without any limitation in the claims. So, yes, what I believe the file history when read its entirety is absolutely clear is they did repeatedly refer to the preferred embodiment as an example of how to do what I was just describing. But they didn't limit the claims in any way in the prosecution history. Did not limit it in any way. They were using it as an example. If you look every single time, every single time, where they talk about the preferred embodiment, right next to it they talk about the more generalized methods that are disclosed in the 137 patent or other of the patents that are incorporated by reference and that the preferred embodiment is exemplary of many methods. And then each time, both times, they end the sections by talking about and this patent is not about how to make them or how to select them. It's about the discovery the first time ever how to use them. If it's so clear, why did the prosecution take so long? I mean, what was the problem that the examiner was having? Oh, well, there are a number of... With respect to the issue we're discussing. This is it on the issue we're discussing. This is it on the issue we're discussing. The patent went on and had other amendments. The examiner was concerned you were claiming too much. Your Honor, it's a long prosecution. There are many, many issues. But this is it on this issue. Okay. Thank you, Mr. Rubin. It's a good place to end. Thanks very much and thanks for allowing me to go over.